**POLINO and PINTO, P.C.**
**A Professional Corporation**
**Moorestown Times Square**
**720 East Main Street, Suite 1C**
**Moorestown, NJ 08057**
**(856) 727-1777**
**Email: Jfpolino@prodigy.net**
**By:   Joseph M. Pinto, Esquire**
**         Attorney for Plaintiffs**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| JUNE GERMINARIO, on behalf of herself and all other class members similarly situated | : : | Civil Case No. 1:20-cv-12130 |
| Plaintiff | : | First Amended Complaint (Pursuant to FRCP 15(1)) |
| v. | : | |
| Ram Payment, L.L.C. t/a Reliant Account Management; Reliant Account Management, L.L.C. (California); Reliant Account Management, L.L.C. (Tennessee); Account Management Systems, L.L.C.; Reliant Account Management Systems, L.L.C.; GS Associated Holdings, L.L.C. (California) a/k/a GS Holdings, L.L.C.; GS Associated Holdings L.L.C. (Arizona) a/k/a GS Holdings, L.L.C.; WST Management, L.L.C.;  Austin Co. L.L.C.; Reliant Management Services, L.L.C.; Stephen Chaya; Gregory Winters, Scott Austin, Stephen Chaya Trust Agreement; Active Debt Solutions, L.L.C. f/k/a Active Debt Solutions, Inc. d/b/a Guardian Legal Center;  Paralegal Support  Group, L.L.C. f/k/a Paralegal Staff Support, L.L.C.; John Doe(s) 1-100, said name of John Doe(s) being fictitious | : : : : : : : : : : : : | |
| Defendants. | : : | |

Plaintiff, JUNE GERMINARIO, on behalf of herself and all other class members similarly situated, residing at 23 Southfield Drive, Sussex, New Jersey, 07461, by way of Complaint against the Defendants, says:

<u>JURISDICTION</u>

This matter was removed from the New Jersey State Superior Court on September 1, 2020 pursuant according to the Notice of Removal 28 U.S.C.§§1332, 1441, and 1446.

INTRODUCTION

The Defendants created and engaged in a plan or scheme to defraud the residents of the State of New Jersey by performing unlawful, illegal, and criminal debt adjustment and money transmission and other activities and engaged in the unauthorized practice of law in the State of New Jersey. The Defendants and their individual members, officers, recruits, representatives, employees and agents, employed, partnered, conspired, aided and abetted and collaborated with both front-end lead generators and back-end service companies, debt adjustment companies, financial institutions and others to provide unlawful debt adjustment and money transmission services as defined by New Jersey law, creating the impression that these services were lawful in the State of New Jersey. In fact, these services were not performed by, nor were they ever intended to be performed by, licensed attorneys, debt adjusters, and money transmitters.

This unlawful plan or scheme is in violation of the New Jersey Debt Adjustment and Credit Counseling Act, N.J.S.A. 17:16G-1, et seq. since these services are performed by for-profit entities or persons not permitted to operate such business or be licensed to do so in New Jersey, and further constitutes the unauthorized practice of law in the State of New Jersey. Transmission of money by wire or other means by the Defendants without a license is a violation

of the New Jersey Money Transmitters Act 17:15-C-1, et al.

Both violations constitute crimes under New Jersey law and are in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq., the New Jersey Racketeer Influence and Corrupt Organizations Act, N.J.S.A. 2C:41-1, et seq., and other State laws.

Plaintiffs seek recovery of monies paid to the Defendants, other damages, and injunctive relief enjoining and restraining the Defendants from conducting such business in New Jersey or with New Jersey residents.

<u>Parties and Facts</u>

1.    Plaintiff June Germinario ("Plaintiff") is a resident and citizen of the State of New Jersey, residing at 23 Southfield Drive, Sussex, New Jersey.

2.    The Defendants, Reliant Account Management, L.L.C. (California); (RAM Calif.); Reliant Account Management, L.L.C. (Tennessee) (RAM Tenn.); Account Management Systems, L.L.C. (AMS); Reliant Account Management Systems (RAMS) and RAM Payment, L.L.C. (RAMP) when referred to herein collectively are designated the principle Defendants.

3.    The other Defendants, RAM Payment, L.L.C. (RAMP), GS Holdings L.L.C. (California) (GS Calif.); GS Holdings L.L.C. (Arizona) (GS Az.); WST Management, L.L.C. (WST); Austin Co. L.L.C. (AUS Co.); Reliant Management Services, L.L.C. (RMS), Stephen Chaya (Chaya); Gregory Winters (Winters), Scott Austin (Austin); Stephen Chaya Trust Agreement (SCTA) when referred to herein collectively are designated as the participating Defendants.

4.    On or about August 16, 2010, Plaintiff entered into a debt settlement program agreement with Legal Helpers Debt Resolution, L.L.C. a/k/a The Law Firm of Macey, Aleman,

Hyslip and Searns ("LHDR"), with principal offices in Chicago, Illinois, for the purpose of having LHDR negotiate a reduction of her indebtedness to various creditors and arrange for payment of these compromised amounts. There were only two creditors with whom Plaintiff authorized LHDR to negotiate - Capital One, owed $4,910.00, and Sears, owed $17,634.00, for a total of $22,544.00.

5.     On or about August 16, 2010, Plaintiff executed a document entitled Special Purpose Account Application under which Global Client Solutions, L.L.C. ("GCS" or "Global") of Tulsa, Oklahoma, was to electronically withdraw funds from Plaintiff's New Jersey bank account and deposit them into an aggregate escrow/trust account (called a Special Purpose Account ["SPA"]) established by GCS in a bank to be chosen by it, and designating a sub-account in the name of the Plaintiff. The purpose of this SPA was to hold funds withdrawn on a monthly basis from Plaintiff's New Jersey bank account in an amount established by LHDR until it received instructions on how they were to be disbursed.

6.     The funds were to be disbursed to pay monies to any creditors who agreed to a settlement of their indebtedness with the Plaintiff, as well as to pay any costs and fees for LHDR's attorneys' services and administrative fees and costs and GCS' costs of administration.

7.     On March 3, 2011, Plaintiff executed a document entitled Legal Helpers Debt Resolution, L.L.C. Amended Letter of Engagement concerning the terms of its representation of the Plaintiff.

8.     Plaintiff was initially advised that her monthly payments under her debt adjustment program would be $407.31. This was increased to $421.06 and on September 24, 2010, GCS began to withdraw the sum of $421.06 from her New Jersey bank account and deposit those funds into the said aggregate SPA in a bank unknown to Plaintiff. Plaintiff was

notified by GCS on May 31, 2012 that her account had been transferred from that bank to Comerica Bank of Dallas, Texas.

9.      GCS withdrew the sum of $421.06 from Plaintiff's New Jersey bank account on September 24, 2010.  On October 26, 2010, GCS began withdrawing the sum of $416.06 from Plaintiff's bank account and continued to do so for another 30 months until April 24, 2014. Global's withdrawals totaled $12,902.86.  On September 26, 2011 GCS withdrew $75.00 from Plaintiff's account for an ACH monthly fee.  The total deposited in Plaintiff's special purpose account was $12,977.86.  From this sum, GCS dispersed illegal customer and transaction fees of $4,888.23 to itself and others while paying creditors only $1,000.00.

10.      On June 3, 2014, Global sent Plaintiff a letter advising her that the relationship between Global and LHDR had been terminated.  LHDR had filed a Chapter 7 bankruptcy petition in 2014.

11.      On June 9, 2014, Plaintiff called GCS to terminate her account and request refund of the funds therein.  Plaintiff was told that such a request had to be in writing and on June 10, 2014, Plaintiff emailed Global instructions to terminate her account.  On June 17, 2014, Global issued a check on an account in Comerica Bank in the sum of $8,517.09, which Plaintiff received and deposited into her checking account.

12.      Global is a for-profit limited liability company formed in Oklahoma in 2003 and located at 4343 South 118th E Avenue, Suite 220, Tulsa, OK 74146.  It is neither registered to do business in New Jersey nor does it maintain an office in this state.

13.      Global markets and advertises itself as follows: It is a service provider to debt settlement companies providing account management services for their customers.  It is one of the largest account management companies in the United States and has developed and

implemented its account management services specifically for the purpose of debt resolution, utilizing among other things non-interest bearing special purpose or dedicated accounts (hereinafter "SPA") which it claims are insured by the FDIC. Global maintains and operates debt management accounts for hundreds of third party businesses that offer debt adjusting services, utilizing electronic withdrawal of funds from a debtors account or receipt of funds forwarded by other means from the debtor and deposits these funds in a Special Purchase or Dedicated Account, administered and maintained by Global.

14.    On or about May 22, 2014, Plaintiff was contacted by a representative of Defendant Guardian Legal Center of Fort Lauderdale, Florida, i.e., Defendant Active Debt Solutions, L.L.C. a/k/a Active Debt Solutions, Inc. d/b/a Guardian Legal Center (hereinafter "Guardian") stating it was taking over the Plaintiff's debt settlement program.

15.    Defendant Guardian utilized Defendant RAM or one of the other principal Defendants as the escrow agent to perform the same function as GCS, as the principal Defendants are in the same business as its competitor GCS. One of the principal Defendants withdrew monies from Plaintiff's New Jersey account and held them in an escrow account for the same purposes as the prior escrow account she maintained with GCS, and directly contacted Plaintiff concerning its role in the process and provided some documentation to her.

16.    Plaintiff was advised her monthly payment under the debt resolution plan would be $416.06 per month and would begin May 23, 2014.

17.    Plaintiff was instructed by Guardian to send the funds she had received from Global to an entity known as Defendant Paralegal Staff Support, L.L.C. ("PSS").  On June 30, 2014, Plaintiff forwarded an electronic check in the sum of $8,127.28 to PSS as instructed.

18.     One of the principal Defendants began withdrawing funds from Plaintiff's bank account on May 23, 2014 in the amount of $416.06 per month.

19.     The last withdrawal from Plaintiff's account occurred on April 24, 2017.  Between May 2014 and April 2017, the following sums were withdrawn from Plaintiff's account: (a) $416.06 for seventeen months [$7,073.02]; (b) $208.03 for two months [$416.06]; (c) $49.00 for eight months [$392.00]; and (d) $35.00 for three months [$105.00] for a total of $7,986.08.  The total paid by Plaintiff under the debt resolution plan was $16,113.36 ($8,127.28 plus $7,986.08).

20.     One of the principal Defendants paid itself at least $9.95 in illegal transaction charges each month for thirty months for a total of $298.50, and also paid illegal sums to itself and Guardian Legal Center as fees in an amount, to the best of Plaintiff's knowledge, equaling all of the funds withdrawn from her account.  To the best of Plaintiff's knowledge, no funds were paid to creditors.

21.     Defendant, RAM Calif. was formed on April 17, 2009 as a domestic limited liability multi-member company by Defendant, Chaya, who was one of the managing members with an address of 1301 Dove Street, 1030 Newport Beach, California 92660, to engage in any lawful act for which a L.L.C. could be organized.

22.     On February 14, 2013 RAM Calif. publically listed GS Calif. of Lake Forest, California and WST of Costa Mesa, California as managers, and Chaya as agent for Services of Process. It described its type of business as payment collection and accounting services. GS Calif. was formed on July 16, 2009 as a California Limited Liability Company stating all of its members were limited liability companies but in an August 21, 2009 filing, Chaya and Winters

were listed as managing members, both residents of California in Lake Forest and Newport Beach respectively. Chaya signed as a member. On August 10, 2015, Chaya signed, as managing member, a filing status change. On January 8, 2018, GS Calif. was publically listed as merged with GS AZ. by filing signed by Chaya as managing member of both entities on December 14, 2017 with a forwarding address at 13112 W. Peck Court, Lichfield Park, Arizona 85340, Attention: Stephen Chaya.

23.    GS AZ. was formed on October 26, 2017 as a domestic Arizona corporation with an address of 13112 W. Peck Court, Litchfield Park, Arizona 85340 and is currently active and in good standing. Chaya is listed as registered agent. It lists its members as of October 26, 2017 to date as RMS, Chris Balger, Diana Hickman, Stuart Bolske, Winters, and the SCTA, dated November 15, 2018 all at the same aforesaid address.

24.    RMS is a domestic Nevada, L.L.C. formed on May 13, 2004, is currently active and publically lists Chaya and Winters as officers and apparently its only members. Their address is listed as 112 North Curry Street, Carson City, Nevada 89703 which is the same address as its registered agent State Agent and Transfer Syndicate, Inc., a professional registered agent company.

25.    The original articles of organization of GS Az. listed Chaya as a member on May 2, 2018, the public record in Arizona reflects GS Calif. merged with GS Az. Chaya signed as managing member on January 4, 2017. On November 16, 2018, the Articles were amended replacing member Chaya with the SCTA dated November 15, 2018 with the aforesaid address in Lichfield Park.  Chaya signed on behalf of the trust agreement.

26.    WST was formed on February 21, 2012 as a California Domestic, L.L.C. for any

lawful purpose with one manager. On February 15, 2013, Defendant, Austin, of Costa Mesa, California was listed as the member manager. On November 7, 2014 the address was changed to Lakewood, California. The current status is showing as FTB suspended.

27.    On March 27, 2017 RAM Calif. listed in the California public records its managing member as GS Calif., of Lake Forest, California with an additional member as Defendant, AUS Co. of Lakewood, California, with  Chaya listed as Vice President and Registered Agent. It's type of business was listed as payment, collection, and accounting services. Winters of Newport, California is listed as Chief Executive Officer.

28.    On May 1, 2018, a certification of merger was filed with by RAM Calif. that it had merged with RAM Tenn. The certification was signed by Chaya and Winters as managing members for both entities. The new RAM Tenn. had an address of 412 North Cedar Bluff Road, Suite 400, Knoxville, Tennessee 37923.

29.    RAM Tenn. was formed on July 27, 2017 in Tennessee and merged with RAM Calif. On November 6, 2017, RAM Tenn. was listed as the surviving entity. On January 17, 2019, RAM Tenn. changed its name to AMS according to Tennessee Secretary of State. It's principle office is listed as 412 N. Cedar Bluff Road, Suite 400, Knoxville, Tennessee 37923 with its registered agent, Sara Paquette, at the same address. It states it has three members.

30.    RAMS, was formed on April 17, 2009, as a California Domestic L.L.C. for any lawful purpose including software,  payment, collection and accounting with more than one manger. On March 27, 2017 it filed a Statement of Information in California listing its address at 1301 Dove Street, Suite 1030, Newport Beach, California with a member-manager of GS Calif. 22054 Arrowhead Lane, Lake Forest, California.  Chaya was listed as its registered agent,

President, and Chief Executive Officer. An additional member listed was AUS Co. Of Lakewood, California.

31.    On March 21, 2018 RAMS filed another Statement of Information in California stating its principle office had changed from Newport Beach, California to 412 N. Cedar Bluff Road, Knoxville, Tennessee 37923. It's manager member was listed at GS Az. 13112 West Peck Court, Lichfield Park, Arizona 85340. It listed its type of business as IP Holdings. An additional member was listed as AUS Co. Of Lakewood, California. It also listed an address of 1220 S. Street, Suite 150, Sacramento, California. The registered agent was Registered Agent Solutions, Inc., with an address the same as the Sacramento address above. Registered Agent Solutions is a professional registered agent company with addresses in all 50 states. This address is not the office of RAMS. It was signed by Winters as President.

32.    A search of the Secretary of State's Office in Tennessee for RAMS reveals no records.

33.    RAMP was formed on October 24, 2018 as a general domestic limited liability company in Delaware with a registered agent of Corporation Trust Co. in Wilmington, Delaware.

34.    RAMP registered as a foreign L.L.C. in Tennessee on January 7, 2019, with a principal address of 412 N. Cedar Bluff Road, Knoxville, Tennessee 37923, with a registered agent of CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919. It took an assumed name of Reliant Account Management of January 17, 2019.

35.    RAMP's Delaware filing lists the above Cedar Bluff Road address as its principal address but it has a mailing address of c/o Westshore Capital Partners, River Gate Tower, 400

N. Ashley Drive, Suite 1175, Tampa, Florida 33602, and states it consists of one member.

36.    RAMP was formed only after Westshore Capital Partners acquired RAM Calif./RAM Tenn. (described as a specialized independent third party payment processor and trust accounting company) by investing a combination of senior secured debt and equity totaling $30 million according to the press release dated January 29, 2019.

37.    According to a declaration of Chaya, Vice President of RAMP, filed in Federal Court dated July 11, 2019, RAMP is owned by RAM America Inc, a Delaware Corporation, formed in October 24, 2018, and RAM America Inc, is owned 60% by Westshore RAM, L.L.C., a Delaware Corporation, formed in October 24, 2018, 40% by RAM Tenn. of which Chaya is a managing member and Vice President. Chaya states he is also a manager and Vice President of RAMS, RAM America, Inc., and GS Az. and that RAMP processes payments, data processing and related accounting. RAM America's principle place of business is 412 N. Cedar Bluff Road, Suite 400, Knoxville, Tennessee 37923. Westshore RAM, L.L.C. has a sole managing member, David Malizia of Florida. RAM Tenn. has several different owners, and again, its principal place of business is 412 N. Cedar Bluff Road, Suite 400, Knoxville, Tennessee 37923: a) 60.2% is owned by AUS Co., a single member L.L.C. owned by Austin who is a California citizen; (b) 4.7% is owned by William Ergas IRA, (c) 35.1% is owned by GS Az. which is owned 47.5% by Chaya, 44.5% by Winters, 1.5% by Hickman Family Trust of California, 1.5% by Diane Hickman of California, 2% by Stuart Bolsho of California and 3% by Chris Bolger of California.

38.    Chaya also declared that RAMS is owned 50% by AUS Co., and 50% by GS AZ. The paragraph states RAMS has a principal place of business in California but does not give the exact address.  This differs from the information obtained from the California Secretary of State,

which states the business and mailing address is 412 N. Cedar Bluff Road, Suite 400, Knoxville, Tennessee 37923, as of March 21, 2018, when its Articles of Incorporation was amended.

39.    The documents in Plaintiff's possession referring to the various RAM Defendants includes:

(A)    A two (2) page accounting with a web address of Ramservicing.com (dated June 24, 2013)
(B)    A four (4) page Privacy Policy statement (dated June 24, 2015) with the same web address as (A) above.

40.    The body of the privacy statement refers to the name of Reliant Account Management only with no entity designation.  It also states that it collects information about the Plaintiff in order to facilitate settlement disbursements and will share this information to the extent necessary with other members of the RAM family of companies, RAM's bank or financial institution and other RAM business partners to assist it in the process. The contact information under the Terms and Conditions Section of the Privacy Statement state that Reliant Account Management can be reached by email at support@Ramservicing.com or mail at Reliant Account Management, P.O. Box 337, Newport Beach, California 92660, 877-859-1450.

41.    Newport Beach, California was the address for Chaya, that appears on the March 27, 2017 amendment to the Articles of Incorporation of RAMS, filed in California. The notation in Plaintiff's bank statements, concerning withdrawals from her account by the principal Defendants appears, for example, in her bank statements of May15, 2014 to June 13, 2014 as: May 23, 2017 RAM DAILY PPDID# -$416.00, and in the bank statement of December 15, 2015 to January 15, 2016 as: 12/23 RAM PMT PPDID# -$416.00, and in the bank statement of April 15, 2017 to May 12, 2017 as: 04/24 RAM PMT PPDID# -$35.00.

42.    A comparison of the 2011 website with the current website (ramservicing.com)

and documents in Plaintiff's possession reveals no reference describing with which entity or entities the Plaintiff or the public was dealing. The current website refers to the aforesaid Knoxville, Tennessee, address as the business location.

43.     In a Notice of Removal filed in Federal Court in this action, the Defendant's RAM Payments, L.L.C. Reliant Account Management, L.L.C., Reliant Account Management Systems, L.L.C. and Account Management Systems, L.L.C. collectively referred to in the Notice of Removal as the "RAM Defendants", stated that RAM Payment L.L.C. is a limited liability company formed under the Law of Delaware with a principal place of business located at 412 N. Cedar Bluff Road, Suite 400, Knoxville, Tennessee 37293, and that RAM Payment processes payments, data processing and related accounting services.

44.     According to April 19, 2019 filing form N-2 with SEC -Registration Statement under the Securities Act of 1933 Capitala Finance Corporation of Charlotte, North Carolina in the Effective Amendment No. 1 to the 10-K filing stated: On January 4, 2019, the company invested $9.2 million in first lien debt and $0.9 million in membership units of Reliant Account Management, L.L.C.

45.     The principal Defendants contracts with individual debt settlement companies (which can be law firms or lay companies) to provide services to the individual consumer customers of the debt settlement company. Among other things, the principal Defendants enter into agreements with consumers allowing them to debit consumers' bank accounts (usually through ACH transfers) in monthly amounts established by the debt settlement companies and deposits these funds in an aggregate trust account from which they are disbursed according to a schedule established by the debt settlement company. The trust account is held in banks in California or wherever they choose.

46.     The principle Defendants pay themselves fees out of these escrow funds and also forwards to the debt settlement companies their costs and fees. They also disburse funds from the escrow account to creditors if debt settlements are reached.

47.     The principle Defendants state, in their marketing propaganda, that their goal is to provide the consumer with an efficient, state of the art settlement solution and to facilitate settlement disbursements.

48.     The principle Defendants also state therein that they are required to comply with the law, and to report suspected illegal activity.

49.     According to the principle Defendants, as of July 2018, they had processed over 750,000 settlement payments which apparently does not include the individual monthly transactions withdrawing funds from consumers' bank accounts or dispersing fees and costs to itself and the debt settlement companies.

50.     Performance of debt adjustment and credit counseling services in New Jersey is regulated by the New Jersey Debt Adjustment and Credit Counseling Act, N.J.S.A. 17:16G-1, et seq. (hereinafter "the Act") and the regulations promulgated by the Commissioner of the Division of Banking and Insurance as authorized under N.J.S.A. 17:16G-4.

51.     Under New Jersey law, no person other than a non-profit social service agency or a non-profit credit counseling agency shall act as a debt adjuster, N.J.S.A. 17:16G-2(a),  and such agencies must first obtain a license to do so from the Department of Banking and Insurance, N.J.S.A. 17:16G-2(b).

52.     A debt adjuster under New Jersey law means a person who either (a) acts or offers to act for a consideration as an intermediary between the debtor and his creditors for the purpose of settling, compounding or otherwise altering the terms of payment of any debts of the

debtor or (b) who to that end receives money or other property from the debtor or on behalf of the debtor for payment to or distribution among the creditors of the debtor. <u>N.J.S.A.</u> 17:16G-1(c)(1).

53.    An attorney at law admitted to practice in the State of New Jersey who is not principally engaged as a debt adjuster shall not be deemed a debt adjuster under the Act and therefore not subject to licensor.

54.    The fees which a licensee may charge for debt adjustment services under the Act shall  not exceed one percent of the gross monthly income of the person to whom the service is rendered, but in no case shall the fee exceed $15.00 per month, except as may be otherwise provided by rule or regulation promulgated by the Commissioner.  The Commissioner is authorized to set the maximum fee for credit counseling. <u>N.J.S.A.</u> 17:16G-6.

55.    Under N.J.A.C. 3:25-1.2, the fee for debt adjustment may not exceed $25.00 per month or $60.00 per month for credit counseling services.

56.    Any debtor injured by violation of the Act may bring a civil action for recovery of damages.

57.    Under the Act, every licensee acting as a debt adjuster shall disburse to the appropriate creditors all funds received from a debtor less any fees permitted by N.J.S.A. 17:16G-6 within ten days of receipt of those funds, maintain a separate trust account in a qualified bank as defined under paragraph 12 of N.J.S.A. 17:9A-1 in the name of the debt adjuster for the benefit of the debtors, serviced by the debt adjuster, and maintain an appropriate ledger book for the trust account required, having at least one single page for each

debtor with the appropriate entries of all deposits into and disbursements from each debtor's account, including copies of all records showing disbursements to creditors and receipts from debtors which legible records shall be maintained in accordance with generally accepted accounting principals for not less than six years following the close of each debtor's account.

Under N.J.S.A. 2C:21-19(f) (and N.J.A.C. 3:25-3.1(d)), any person who shall act or offer to act as a debt adjuster without a license as required by the Act unless exempted from licensor pursuant to the Act shall be guilty of a crime of the fourth degree.

58.    The New Jersey Money Transmitters Act, N.J.S.A. 17:15C-1, et seq. (the "Act") requires persons engaging in business in New Jersey of either (1) the receipt of money for transmission or transmitting money within the United States or locations abroad by any and all means, including but not limited to payment instrument, wire, facsimile, electronic transfer or otherwise for a fee, commission or other benefit, or (2) the receipt of money for obligor for the purpose of paying obligor' bills, invoices or accounts for a fee, commission or other benefit paid by the obligor (N.J.S.A. 17:15C-2), to obtain a license (N.J.S.A. 17:15C-4) and post a bond or other security N.J.S.A. 17:15C-6).  The Act does not apply to licensed debt adjusters N.J.S.A. 17:15C-3(a)(6) or banks N.J.S.A. 17:15C-3(a)(4)). Acting as a money transmitter without a license constitutes a crime of the third degree under the Act, N.J.S.A. 17:15C-24.

59.    The actions of and the services provided by all of the Defendants and all of their individual servants, agents and employees are those of debt adjusters and money transmitters as defined by New Jersey statute and none of the Defendants are licensed to do so.

60.    The Defendants are not attorneys at law of the State of New Jersey and were principally engaged as debt adjusters, thus, they are not exempt from the licensing requirement

of the statute and also are engaged in the unauthorized practice of law in the State of New Jersey.

61.    The business of debt adjustment and provision of debt resolution services are considered the practice of law under the laws of the State of New Jersey.

62.    All of the Defendants and their agents, servants and employees, by operating as a business providing debt adjustment and resolution services, are engaged in the unauthorized practice of law.

63.    Under <u>N.J.S.A.</u> 2C:21-22(a), a person is guilty of a disorderly persons offense if the person knowingly engages in the unauthorized practice of law and under subsection (b) is guilty of a crime of the fourth degree if the person knowingly engages in the unauthorized practice of law and creates the false impression that the person is licensed to practice law or derives a benefit or in fact causes injury to another.

64.    All of the Defendants have also engaged in a criminal conspiracy as defined by <u>N.J.S.A.</u> 2C:5-2 by formulating,  promoting, facilitating and engaging in the crimes of unlawful debt adjustment, unlawful money transmitting and the unauthorized practice of law.

65.    All of the Defendants created the basic plan and operating procedure to engage in the debt adjustment business and money transmissions within the State of New Jersey. Defendants, attempted to gain a competitive advantage in the debt adjustment marketplace and deceive consumers by acting or intimating they could lawfully do business in New Jersey.

66.    Consumers in New Jersey were misled into believing they were being represented by entities and persons authorized to do business in New Jersey as debt adjusters and thus would receive the professional services expected from them by the general public.

67.     The Defendants created a marketing and promotion program to attract debtors through advertising in the media and contracting with agents and lead providers for the purpose of contracting with debt settlement companies.

COUNT ONE
Violations of New Jersey RICO Act

68.     Plaintiff repeats the allegations of the first 67 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

69.     All of the Defendants are debt adjusters as defined under N.J.S.A. 17:16G-1(c)(1) and none of the Defendants are licensed money transmitters as defined by the New Jersey Money Transmitters Act.

70.     All Defendants are enterprises either separately and/or in unison as defined under N.J.S.A. 2C:41-1(c).

71.     At all relevant times, all Defendants were engaged in trade or commerce or in activities affecting trade or commerce in connection with the sale of debt adjustment and money transmissions services in the State of New Jersey to New Jersey residents.

72.     The Defendants are persons as defined by N.J.S.A. 2C:41-2(b).

73.     These persons were either employed by or associated with each other and conducted or participated directly or indirectly in the conduct of the affairs of these enterprises through a pattern of racketeering activity in violation of N.J.S.A. 2C:41-2(c) and received income derived directly or indirectly from a pattern of racketeering activity by engaging in crimes under Chapter 20 and Chapter 21 of Title 2C of the New Jersey Statutes.

74.     All the Defendants have, among other things, engaged in a pattern of racketeering, including criminal conduct that has either the same or similar purposes, results, participants,

victims, methods of commission or are otherwise inter-related by distinguishing characteristics and are not isolated incidents.

75.     The criminal conduct includes, but is not limited to, violation of the following New Jersey Statutes:

A.     Theft by deception, N.J.S.A. 2C:20-4;

B.     Deceptive business practices, N.J.S.A. 2C:21-7(h) by making false and misleading written statements for the purposes of obtaining property;

C.     Falsifying records or uttering any writing or record knowing that it contains a false statement or information with purpose of deceive or injury anyone or to conceal any wrongdoing, N.J.S.A. 2C:21-4(a);

D.     Engaging in bank fraud, 18 U.S.C. 1344;

E.     Engaging in wire fraud, 18 U.S.C. 1343;

F.     Issuing false financial statements, N.J.S.A. 2C:21-4(b);

G.     Making false or misleading statements in any advertisement addressed to the public or to a substantial segment thereof for the purpose of promoting the purchase or sale of services, N.J.S.A. 2C:21-7e;

H.     Selling, offering or exposing for sale or delivery less than the represented quantity of services, N.J.S.A. 2C:21-7b;

I.     Applying or disposing of property that has been entrusted to one as a fiduciary in the manner one knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted, whether or not the actor has derived a pecuniary benefit, N.J.S.A. 2C:21-15;

J. Causing or inducing another by deception as to the contents of the instrument to execute the instrument effecting or purposely to effect or likely to effect the pecuniary interest of the person, N.J.S.A. 2C:21-16;

K. Impersonating another or assuming a false identity to obtain a benefit for one's self or another or to injure or defraud another, N.J.S.A. 2C:21-17(a)(1), (2), (3), (4) and (5);

L. Acting or offering to act as a debt adjuster without a license and without qualifying for any exemption from the license requirement, N.J.S.A. 2C:21-19(f);

M. Knowingly engaging in the unauthorized practice of law, N.J.S.A. 2C:21-22(a);

N. Knowingly engaging in the unauthorized practice of law and creating or reinforcing a false impression that the person is licensed to engage in the practice of law or derives a benefit therefrom or in fact causes injury to another, N.J.S.A. 2C:21-22(b)(1), (2) and (3);

O. Transporting or possessing property known or which a reasonable person would believe to be derived from criminal activity, N.J.S.A. 2C:21-25(a), (b)(1), (2)(a), (b), (c) and (d);

P. Conspiracy to commit the aforesaid crimes, N.J.S.A. 2C:5-2 and all its subparts;

Q. Conspiring to violate any of the provisions of N.J.S.A. 2C:41-2(c);

R. Engaging in fraud or swindles, 18 U.S.C. 1341;

S. Engaging in a conspiracy to fraud and swindle, 18 U.S.C. 1349; and

T.    Knowing and willfully violating the Money Transmitters Act, N.J.S.A. 17:15C-24.

76.    The acts undertaken by the Defendants in furtherance of racketeering activity include, but are not limited to:

A.    Engaging, employing, recruiting persons or entities to commit violation of the aforesaid crimes, which include lead generators, debt relief companies and service companies and their agents, servants and employees;

B.    Lending a name to others for the purpose of creating a false pretense that legal and debt adjustment services are unlawfully being performed;

C.    Marketing and soliciting materials and preparing and providing documentation and making oral representations giving the false impression that Defendants services were lawful;

D.    Unlawfully managing, counseling, selling, pro rating or liquidating the indebtedness of a debtor and involving a designated third party's receipt of debtor's funds for the purpose of distributing said funds among creditors in payment of debt obligations;

E.    Conspiracy to carry out an unlawful business scheme described in this Complaint;

F.    Falsely promising to provide debt relief and money transmission services and accepting money from debtors in reliance on those promises;

G.    Receiving or paying commissions, fees and other remuneration for unlawful services rendered by Defendants to debtors;

H.    Advertising, marketing, promoting and providing contracts and other

documentation which falsely create an illusion or impression that debt relief and money transmissions services are being or will be lawfully performed;

I.    Collecting illegal fees, charges and costs for performing illegal services;

J.    Accepting money from New Jersey residents knowing that it is unlawful to do so;

K.    Conspiracy with and amongst themselves and others to violate the provisions of N.J.S.A. 2C:41-2(d); and

L.    Receiving income or proceeds directly from the pattern of racketeering.

WHEREFORE, the Plaintiff demands judgment:

A.    Finding that the acts and omissions of the Defendants constitute multiple violations of Civil RICO, N.J.S.A. 2C:41-1, et seq.;

B.    Finding that the acts and omissions of the Defendants constitute multiple instances of unlawful practices in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.;

C.    Permanently enjoining and restraining the named Defendants, and Defendants John Doe(s) 1-100, said names being fictitious, being defined as their owners, members, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, independent contractors, co-conspirators and any banks and/or financial institutions into which Plaintiff's or class members' money was deposited, and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

D.    Freezing all assets of the Defendants wherever located and preventing

Defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

E.    Disgorgement of all illegal fees, charges and costs and other funds not already paid to creditors of the victimized Plaintiffs so as to restore to them any money acquired by the unlawful acts of the Defendants;

F.    Compensatory and punitive damages and trebling of the damages of Plaintiffs as permitted by the Consumer Fraud Act and New Jersey Civil RICO Act;

G.    Requiring the Defendants to pay all attorney's fees, costs and litigation expenses incurred by the Plaintiffs;

H.    Requiring Defendants to pay pre-judgment interest on all of Plaintiffs' damages;

I.    Such other relief as the Court deems equitable and just under the circumstances.

COUNT TWO
Violations of New Jersey Consumer Fraud Act

77.    Plaintiff repeats the allegations of the first 76 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

78.    The Defendants in the operation of this unlawful business scheme and plan and their individual actions as part thereof have engaged in unconscionable commercial practices and fraudulent activity, made false promises and misrepresentations and knowingly omitted facts as described above in violation of N.J.S.A. 56:8-2 which include but are not limited to those acts set forth above, which have damaged the Plaintiff.

79.    Additionally, Defendants have violated various federal laws which constitute

Page 23 of  59

violations of the New Jersey Consumer Fraud Act, such as the Consumer Financial Protection Act and by paying fees to themselves and debt settlement companies in violation of the Federal Telemarketing Act and rules and regulations.

80.     RAM and RAMS have been involved in administrative proceedings with the Connecticut and Pennsylvania Departments of Banking and Insurance and the Oregon Department of Consumer and Business Services concerning operations in those states without a license as follows:

A.     <u>Connecticut</u>: Both RAM and RAMS engaging in the business of money transmission without a license and entering into a consent order for monetary sanctions, to cease and desist from engaging in business of money transmission without a license, and to refund all fees paid by Connecticut residents for money transmissions services through the date of the consent order, September 28, 2015. The order was signed by Winters, as President of RAM and RAMS. The order did not include any provision stating that those companies were entering into the consent order without any admission of liability.

B.     <u>Pennsylvania:</u> RAM engaging in the transmission of money without a license in conjunction with servicing customers of debt settlement companies and entering into a consent order (without admission of liability) dated September 21, 2018 for monetary sanctions, permitting a license application to be made. The order was signed by Chaya as Vice President.

C.     Oregon: Both RAM and RAMS engaging in the business of debt management services and in the business of money transmission without a license and entered into a consent order (without admission of liability) for monetary sanctions, allowing them to apply for a license or in lieu thereof advising the public on its website that its services are not available in

Oregon. The order is dated November 26, 2018 and was signed by Chaya stating that he is an officer (Vice President) and control person of RAM and RAMS on November 6, 2018.

The statutes in these states are the same or similar to the New Jersey Money Transmitters Act and the New Jersey Debt Adjustment Act.

81.    The Defendants knew or should have known that they were operating in violation of both of these New Jersey Acts as RAM and Chaya were involved in litigation in New Jersey in which they along with a competitor, Global Client Solutions L.L.C., and a debt settlement company with which they did business, Legal Helpers Debt Resolution, L.L.C., were alleged to have violated both of these New Jersey Acts. Giudotti v. Legal Helpers Debt Resolution, L.L.C. et al. Docket No. 1:11-CV-01219 filed March 17, 2011. RAM and Chaya were both represented by counsel, filed an answer, but the matter was administratively dismissed as to them on April 28, 2017 as Global Client Solutions and the Plaintiff, Giudotti entered into a settlement. RAM and Chaya were aware that Global Client Solutions, L.L.C. which was and still is in the same business as RAM and Chaya were subject to the New Jersey Debt Adjustment and Money Transmission Acts.

82.    The Defendants knew or should have known that the various Debt Settlement Companies they were doing business with were engaged in illegal, unlawful, or criminal acts but intentionally ignored or disregarded those facts to continue their own unlawful, illegal, and criminal acts.

A.    The unserved and defunct Defendants in this case, Active Debt Solutions, L.L.C. f/k/a/ Active Debt Solutions, Inc. d/b/a as Guardian Legal Center and Guardian Legal Group, Paralegal Support Group, L.L.C. were involved in several lawsuits in which injunctions

prevented them from further operations due to illegal activities without limitations, <u>FTC and State of Florida v. Jeremy Lee Marcus et al.</u>  Docket No. 17-60907 (S.D. Fla.), filed May 8, 2017, alleging illegal conduct through a maze of interrelated companies from at least 2013.

B.    <u>FTC v. American Financial Benefits Center et al.</u> U.S. District Court Northern District Court California, Docket No. 4:18-CV-00806 and 4:17-CV-04817 (filed February, 2018) alleging illegal conduct by RAM debt settlement clients since at least 2014, resulting in injunctive relief and appointment of a receiver.

C.    Besides the aforementioned <u>Giudotti</u> case concerning Legal Helpers Debt Resolution L.L.C. (LHDR), which was a client of the Defendants, (which had been sued numerous times along with the individual  members of LHDR both administratively and in the courts, and which had millions of dollars in judgments entered against them), the Defendants were involved in a lawsuit with LHDR itself in a dispute concerning the release of funds held in escrow buy the Defendants for LHDR consumer customers, <u>Legal Helpers Debt Resolution, L.L.C. v. Reliant Account Management, et al.</u> U.S. District Court California, Docket No. 12-00493 (filed February 2, 2012) alleging the Defendants did not adhere to LHDR's request to remit customer funds to LHDR in accordance with the agreement between them.

D.    The Defendants were well aware of the illegal activities of LHDR in 2012 and thereafter. LHDR filed a Chapter 7 Bankruptcy Petition on September 29, 2014 in the Bankruptcy Court for Northern District of Illinois, Docket No. 14-35193 listing over 70 million dollars in debt.

E.    Defendants, RAM and RAMS were involved in litigation the same or similar to the current lawsuit alleging that they and some of their debt adjustment clients were

engaged in the unlawful practice of debt adjusting in the State of New Jersey under the New Jersey Debt Adjustment Act in the case of <u>Wilson et al v. Green Financial et al</u> District Court of New Jersey Docket No. 2:16-CV-00097 (filed January 1, 2016) alleging violation of the New Jersey Consumer Fraud Act, the New Jersey RICO Act and seeking damages and class certification. The action was settled in March 2016 and dismissed with prejudice.

   F. Defendant RAM was involved in litigation similar to the current case alleging that it engaged or aided and abetted its debt adjustment clients in unlawful practices in <u>Leitz v. Reliant Account Management, et al.</u> U.S. Bankruptcy Court S. D. Mississippi (filed February 6, 2019) Docket No. 18-51548 to which it filed an answer but then settled and <u>Daum v. Legal Helpers Debt Resolution, L.L.C., Reliant Management and Reliant Account Management Systems, et al.</u> Federal District Oregon, Docket No. 3:12-CV-01914 and 12-CV-02210, filed February 6, 2012.

   G. Defendants knew or should have known of litigation filed by the Consumer Financial Protection Bureau against their main competitor Global Client Business Solutions, L.L.C., U.S. District Court Cent. Dt. California Docket No. 2:14-CV-6643, (filed August 25, 2014) alleging Global engaged in illegal, unlawful conduct in conjunction with or aided, abetted and facilitated various debt settlement companies in such practices in processing payments of consumers in debt relief programs. This case ended in a settlement of over 7 millions dollars. Not only Global was sued but some of its individual members were made Defendants for participating in said conduct.

   H. Defendants were also involved in litigation with their debt settlement clients raising many of the same type of claims as the current action in <u>GRIJALUA et al v.</u>

<u>Mason, Reliant Account Management, et al,</u> U.S. District, California Docket No. 18-02010, filed May 28, 2019.

I.      Defendants knew or should have known of the GAO report of the wide-scale fraudulent practices in the Debt Settlement Industry of April 22, 2010, GOA-10-593T.

84.     The principal Defendants are third-party payment processors that have systematically enabled its clients to withdraw millions of dollars' worth of unauthorized or otherwise illegal charges from consumers' bank accounts.

85.     The principal Defendants have processed transactions for many of their clients when they knew, or should have known or consciously avoided knowing that many of the transactions initiated by those clients were fraudulent or illegal. For many years, the principal Defendants have ignored numerous red flags about the transactions they were processing, including repeated consumer complaints, and lawsuits, warnings about potential fraud or illegality raised by banks involved in the transactions, unusually high return rates, and private, state, and federal law enforcement and administrative actions again them, their clients, and their competitors. The principal Defendants have performed only perfunctory due diligence regarding the legitimacy and legality of their own and their clients' underlying transactions and have ignored indicia of fraud or illegality revealed through even their minimal due diligence. By providing these clients with access to the banking system and the means to extract money from consumers' bank accounts, the principal Defendants have played a critical role in this unlawful conduct.

86.     The principal Defendants are third-party payment processors that process electronic funds transfers through the Automatic Clearing House (ACH) network and other means on behalf of its clients.

87.     The principal Defendants are covered persons under the Consumer Financial Protection Act (CPFA) because they provide payments or other financial data processing products or services to consumers by technological means, including through a payments system or network used for processing payments data. 12 U.S.C. § 5481(15)(A)(vii).

88.     The principal Defendants are also service providers to covered persons because they process transactions relating to consumer financial products or services. 12 U.S.C. §§5481(26)(A)(ii).

89.     At all times material to this Complaint, Defendants are transacting or have transacted business in the State of New Jersey.

90.     The participating Defendants are and were, at all times material to this Complaint, founders, officers, members, agents and representatives of the principal Defendants.

91.     The participating Defendants are involved in many different aspects of operations, such as client management, bank relationships, operations, product development and processing.

92.     At all times material to this Complaint, acting alone, or in concert with others, the participating Defendants formulated, directed, controlled, participated, or otherwise engaged in the acts and practices set forth in this Complaint.

93.     The participating Defendants as members, officers, agents, representatives, or employees charged with managerial responsibility, materially participated in the conduct of the principal Defendants' affairs, including the development and approval of the practices complained of herein.

94.     Given their status with and material participation in the principal Defendants' operation, they are "related persons" under CFPA. 12 U.S.C. § 5841(125). Because of their

status as "related persons" under the CFPA, they are "covered persons" under the CFPA. Id.

95.    They are also "covered persons" under the CFPA, 12 U.S.C. § 5841(15)(A)(vii) and 26(A), because they are engaged in providing payments or other financial data processing products or services to consumers by technological means, including through a payment system or network used for processing payment data. 12 U.S.C. § 5841 (15)(A)(vii).

96.    At all times material to this Complaint, Defendants transacted business in New Jersey but live and work outside the State.

97.    As third-party payment processors, the principal Defendants provide their clients with access to banks and financial institutions, to debit and credit funds electronically from consumers' bank accounts, using what is known as the ACH system. The principal Defendants' clients have included payday lenders, auto title lenders, sales finance companies, debt collectors, debt adjusters, debt settlement companies and pro raters, among others.

98.    The ACH system is an electronic payments network used to process financial transactions, such as credits or debits (deposits or withdraws), instead of using paper checks.

99.    The ACH system can be used to transfer funds related to a variety of financial transactions, such a bill or debt settlement payments and loan advances or payments.

100.    Businesses and individuals use third-party payment processors when they are unable to establish their own relationships with banking institutions or because it is administratively convenient for them.

101.    In the ACH system, the businesses and individuals that are clients are known as "Originators".

102.    Originators send requests to either credit or debit an individual's or business's

bank account.

103.    The principal Defendants convey that request to their own bank, known as the "Originating Deposit Financial Institution" (ODFI).

104.    The ODFI then sends the credit or debit request to an ACH Operator.

105.    The ACH Operator transmits the request to the recipient's bank, known as the "Receiving Depository Financial Institution" (RDFI).

106.    The RDFI then either credits the recipient's account, or in the case of a debit transaction, deducts the amount and send the money back to Defendants through the ODFI.

107.    The principal Defendants then remit the debit amount back to its client and charges the client a variety of fees for its services and in the case of debt settlement companies deposit illegal fees into their accounts and fund with aggregated escrow accounts for consumers.

108.    In a typical transaction that the principal Defendants undertake on behalf of a client such as a lender or debt adjuster or collector, the client instructs the principal Defendants to withdraw payments from a borrower's or consumer's bank account, directing which bank to contact, the payment schedule to use, and the amount to withdraw. Defendants instruct their banks to contact the borrower's or consumer's bank to withdraw the money. The borrower's or consumer's bank debits the account and remits it to the principal Defendants' bank, and the principal Defendants then transfer the money to its clients.

109.    Industry rules, guidelines and regulations emphasize the responsibility of all ACH participants, including third party payment processors like the principal Defendants to monitor return rates and other suspicious activity to detect and prevent fraud in the ACH network .

110.    The principal Defendants, however, have processed payments for many clients

even in the face of numerous indicators and warnings that those clients were engaged in fraudulent or illegal transactions. Even though they knew or should have known of this illegal behavior which Defendants disregarded, they continued to process for these companies. Defendants have ignored red flags including evidence of the unlawfulness of the transactions they were processing, complaints from consumers, high return rates, and law enforcement and private actions against them and their clients. The principal Defendants due diligence procedures when signing up clients have also been perfunctory, or non-existent, and it has ignored indicia of problems that were or would have been revealed through even minimal due diligence.

111.    The principal Defendants have ignored red flags, such as private and government law enforcement activity relating to themselves and their clients, failed to take action in response to learning about private, state, and federal law enforcement actions against its clients, and continued to process for these clients despite this knowledge.

112.    Despite their knowledge the principal Defendants continued to process for these clients without taking any meaningful steps to investigate the their activities or prevent them from processing ACH transactions to consumers by Defendants.

113.    Moreover, despite this knowledge, Defendants did not change their due diligence procedures generally to inquire about whether clients' activities were lawful in the states where the principal Defendants processed ACH transactions on their behalf.

114.    The principal Defendants have ignored red flags apparent during the client application process that should have caused it to conduct further investigations or perform enhanced due diligence prior to accepting a client for processing.

115.    The principal Defendants' application process is perfunctory. Rarely did they

probe deeper in response to any information learned as part of the application process.

116.    For example, as part of its application process, the principal Defendants would search a prospective clients' name on a variety of internet databases.

117.    Troubling information the principal Defendants learned from these sources frequently did not stop them from processing for those clients. For example, when the principal Defendants learned about adverse actions and information against their clients, they did not reassess their relationship with this client or investigate the activities of these entities further.

118.    Similarly, although the principal Defendants reviewed Better Business Bureau (BBB) ratings and complaints, such reviews rarely if ever triggered further investigation into the reasons or sources of the complaints or poor ratings.

119.    The principal Defendants standard practice was to not investigate or follow up with clients when faced with evidence of poor BBB ratings to determine whether these clients were, in fact, engaged in illegal behavior.

120.    The principal Defendants asked for basic information about the types of goods and services its clients provided to consumers, but did not request information designed to elicit whether such goods or services were lawful. Defendants knew that the debt settlement companies were in that business as it was set forth in the contracts between them and the principal Defendants hired sales agents to find debt settlement clients for them.

121.    The principal Defendants did not require copies of a client's policies and procedures to ensure compliance with federal and state laws and regulations. The principal Defendants would not ask for a description of the terms, of contracts or fees charged to consumers, a list of web addresses used by the client or whether a client possessed the required

state licenses, and if so, produce a copy. This type of information would have alerted the principal Defendants to possible fraudulent or illegal activity by its clients. Defendants used their clients to obtain signatures on Defendants' contracts directly with consumers as part of the debt settlement engagement process and permitted clients to use their name or description of their services in marketing the clients debt settlement services to the consumers.

122.    Despite the presence of numerous red flags about its clients, the principal Defendants did not alter their application process to seek additional information.

123.    If the principal Defendants due diligence had revealed that a client was unlicensed, that should have been a red flag that prompted further inquiry.

124.    The principal Defendants policy was to not take further steps even though it was on notice of complaints about unlicensed and unlawful debt settlement practices and other problems with its clients from ODFIs, consumers, law enforcement and government regulators or litigation in which they were involved.

125.    In fact, red flags discovered during the application process and any yearly review process had no impact on the principal Defendants business decisions at all.

126.    Instead, the principal Defendants decision to accept a new client, or continue processing for an existing client were not based on any viable "risk assessment"

127.    The principal Defendants did not consider indicators of fraud or illegal activity such as consumer disputes, poor BBB rating, private, state, or federal law enforcement actions, high return rates, rates of requests for proofs of authorization, or the failure to supply satisfactory information in the company's application.

128.    In their roles as members, officers, agents, representatives and employees of the

principal Defendants, the participating Defendants were involved directly and indirectly in the acts and practices of actively ignoring numerous red flags related to the principal Defendants payment processing activities and substantially assisted the principal Defendants in their commission of unlawful, illegal and criminal acts and practices by continuing to process ACH transactions in the face of indicia of fraud and illegality on the part of numerous clients.

129.    The participating Defendants have been materially involved in the principal Defendants day-to-day business operations and client and banking relationships, and have been aware of numerous red flags raised by the principal Defendants clients' business activities, including high return rates, warning from banks, consumer complaints, and law enforcement actions. In response, none of the participating Defendants investigated or re-evaluated the relationships with these clients, but rather actively ignored this information, and created policies to do so, tried to allay the banks concerns, and when that did not work, entered into new ODFI arrangements so that the principal Defendants could continue processing payments.

130.    The participating Defendants have received personal financial gain from the illegal practices discussed herein. The participating Defendants have received millions of dollars in distributions from the revenue generated by the principal Defendants payment processing activities.

131.    In 2018, in light of the history of litigation in which the Defendants were involved in,  Chaya fraudulently and unlawfully transferred his interest in the Defendants to what is probably a spend thrift Trust over which he maintains control directly or indirectly in an attempt to shield his assets from personal liability for their illegal acts. He also transferred his interests to other Defendants for the same purposes.

132.    The CFPA prohibits covered persons or services providers from engaging "in any unfair, deceptive, or abusive act or practice". 12 U.S.C. §§ 5531, 5536(a)(1)(B). An act or practice is unfair if the act or practice causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

133.    Under the CFPA, a "related person" is deemed to mean a covered person. A related person is:

(I) any director, officer, or employee charged with managerial responsibility for, or controlling shareholder of, or agent for, such covered persons;

(ii) any shareholder, consultant, joint venture partner, or other person, as determined by the Bureau (by rule or on a case-by-case basis); and

(iii) any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in any...violations of any provision of law or regulation...or breach of a fiduciary duty. 12 U.S.C. § 5481(25).

134.    The CFPA defines a "service provider" as "any person that provides material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or services." 12 U.S.C. §5481(26).

135.    The CFPA further makes it unlawful for any person to knowingly or recklessly provide substantial assistance to a covered person or service provider engaged in unfair, deceptive, or abusive acts or practices; the provider of substantial assistance is deemed in violation of the law to the same extent as the person to whom such assistance is provided. 12 U.S.C. § 5536(a)(3).

136.    Defendants are "covered person[s]", "related person[s]" and/or "service provider[s]' within the meaning of the CFPA. 12 U.S.C. § 5481(6), (25). (26).

137.    In numerous instances, Defendants ignored warnings from industry, consumers, and law enforcement that they and their clients were engaged in illegal or fraudulent activities and failed to conduct reasonable due diligence to detect the unlawful conduct.

138.    Defendants' act and practices in processing transactions to consumer's bank accounts as described above caused, or were likely to cause, substantial injury to consumers that is not reasonably avoidable by consumers and was not outweighed by countervailing benefits to consumers or to competition.

139.    Defendants acts and practices, therefore, constitute unfair acts or practices in violation of CFPA, 12 U.S.C. § 5531(a) and (c)(1) and 5536(a)(1)(B).

140.    Under the CFPA, it is unlawful for any person to "knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of section 1031, or any rule or order issued thereunder." 12 U.S.C. § 5536(a)(3).

141.    The participating Defendants have provided substantial assistance to the principal Defendants unlawful conduct by establishing, directing, and managing the principal Defendants operations, including managing client and banking relationships, and exercising substantial control over the principal Defendants operations on a day-to-day basis.

142.    The participating Defendants knowingly or recklessly have provided this substantial assistance by continuing to maintain relationship with, and process transactions for, clients when they knew about warnings from industry, consumers, and law enforcement that they and their clients were engaged in fraud or illegal activity, knew about the risk of harm or

consumers, or knew facts that made the risk of harm obvious.

143. Therefore, Defendants Chaya and Winters and the other participating Defendants knowingly or recklessly provided substantial assistance to Defendants covered persons and service providers engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

144. Defendants have caused consumers substantial monetary loss by debiting money from consumer's bank accounts on behalf of themselves and their clients engaged in unlawful practices.

145. In additional to these debits, consumers have also incurred or were likely to incur other costs, such as the costs associated with closing accounts, paying overdrafts fees, covering bounced checks, opening new accounts, and ordering new checks.

146. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants violations of the CFPA. Consumers could not have reasonably avoided this injury.

147. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and the harm the public.

WHEREFORE, the Plaintiff demands judgment:

A.    Finding that the acts and omissions of the Defendants constitute multiple instances of unlawful practices in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.;

B.    Permanently enjoining and restraining the named Defendants and Defendants John Doe(s) 1-100, said names being fictitious, being defined as their owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives,

independent contractors, co-conspirators and any banks and/or financial institutions into which Plaintiff's or class members' money was deposited, and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

      C.     Freezing all assets of the Defendants wherever located and preventing Defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

      D.     Disgorgement of all illegal fees, charges and costs and other funds not already paid to creditors of the victimized Plaintiff so as to restore to him any money acquired by the unlawful acts of the Defendants;

      E.     Compensatory and punitive damages and trebling of the damages of Plaintiff as permitted by the Consumer Fraud Act and New Jersey Civil RICO Act;

      F.     Requiring the Defendants to pay all attorney's fees, costs and litigation expenses incurred by the Plaintiff;

      G.     Requiring Defendants to pay pre-judgment interest on all of Plaintiff's damages;

      H.     Such other relief as the Court deems equitable and just under the circumstances.

## COUNT THREE
### Violation of New Jersey Debt Adjustment and Credit Counseling Act and Money Transmitters Act

148.    Plaintiff repeats the allegations of the first 147 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

149.    The acts of the Defendants have damaged the Plaintiff who is entitled to recover his damages pursuant to and the provisions of the New Jersey Debt Adjustment Act and  Money Transmitters Act.

WHEREFORE, the Plaintiff demands judgment:

A.    Finding that the acts and omissions of the Defendants constitute multiple instances of unlawful practices in violation of the New Jersey Credit Counseling and Debt Adjustment Act; N.J.S.A. 17:16G-1, et seq. and the New Jersey Money Transmitters Act.

B.    Permanently enjoining and restraining the named Defendants, and Defendants John Doe(s) 1-100, said names being fictitious, being defined as their owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, independent contractors, co-conspirators and any banks and/or financial institutions into which Plaintiff's or class members' money was deposited, and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

C.    Freezing all assets of the Defendants wherever located and preventing Defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

D.    Disgorgement of all illegal fees, charges and costs and other funds not already paid to creditors of the victimized Plaintiff so as to restore to him any money acquired by the unlawful acts of the Defendants;

E.    Compensatory and punitive damages and trebling of the damages of Plaintiff as permitted by the New Jersey Debt Adjustment and Credit Counseling Act, the New

Jersey Money Transmitters Act, the Consumer Fraud Act and New Jersey Civil RICO Act;

F.    Requiring the Defendants to pay all attorney's fees, costs and litigation expenses incurred by the Plaintiff;

G.    Requiring Defendants to pay pre-judgment interest on all of Plaintiff's damages;

H.    Such other relief as the Court deems equitable and just under the circumstances.

COUNT FOUR
Civil Conspiracy

150.    Plaintiff repeats the allegations of the first 149 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

151.    The Defendants, acting in concert, committed the aforesaid unlawful acts or lawful acts by unlawful means for the purpose of injuring the Plaintiffs.

152.    Defendants understood the objectives of the conspiracy, accepted and agreed, either explicitly or implicitly, to do their part to further those objectives.

153.    As a result thereof, the Plaintiff has suffered damages.

WHEREFORE, the Plaintiff demands judgment:

A.    Finding that the acts and omissions of the Defendants constitute multiple instances of unlawful practices in violation of the aforesaid New Jersey laws and that Defendants conspired to commit such violations;

B.    Permanently enjoining and restraining the named Defendants, and the Defendant John Doe(s) 1-100, said names being fictitious, being defined as their owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives,

Page 41 of 59

independent contractors, co-conspirators and any banks and/or financial institutions into which Plaintiff's or class members' money was deposited, and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

C.    Freezing all assets of the Defendants wherever located and preventing Defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

D.    Disgorgement of all illegal fees, charges and costs and other funds not already paid to creditors of the victimized Plaintiff so as to restore to him any money acquired by the unlawful acts of the Defendants;

E.    Compensatory and punitive damages and trebling of the damages of Plaintiff as permitted by the Consumer Fraud Act and New Jersey Civil RICO Act and other New Jersey law;

F.    Requiring the Defendants to pay all attorney's fees, costs and litigation expenses incurred by the Plaintiff;

G.    Requiring Defendants to pay pre-judgment interest on all of Plaintiff's damages;

H.    Such other relief as the Court deems equitable and just under the circumstances.

COUNT FIVE
<u>Unjust Enrichment</u>

154.    Plaintiff repeats the allegations of the first 153 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

Page 42 of  59

155.    Defendants will be unjustly enriched if permitted to retain the monies paid to them directly or indirectly resulting from their unlawful acts. As a result thereof, Plaintiff has suffered damages.

WHEREFORE, the Plaintiff demands judgment:

A.    Finding that the acts and omissions of the Defendants constitute multiple instances of unlawful practices in violation of the aforesaid New Jersey laws, and that Defendants have been unjustly enriched.

B.    Permanently enjoining and restraining the named Defendants, and Defendant John Doe(s) 1-100, said names being fictitious, being defined as their owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, independent contractors, co-conspirators and any banks and/or financial institutions into which Plaintiff's or class members' money was deposited, and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

C.    Freezing all assets of the Defendants wherever located and preventing Defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

D.    Disgorgement of all illegal fees, charges and costs and other funds not already paid to creditors of the victimized Plaintiff so as to restore to him any money acquired by the unlawful acts of the Defendants;

E.    Compensatory and punitive damages and trebling of the damages of Plaintiff as permitted by the Consumer Fraud Act and New Jersey Civil RICO Act and other

New Jersey law;

       F.    Requiring the Defendants to pay all attorney's fees, costs and litigation expenses incurred by the Plaintiff;

       G.    Requiring Defendants to pay pre-judgment interest on all of Plaintiff's damages;

       H.    Such other relief as the Court deems equitable and just under the circumstances.

COUNT SIX
<u>Unconscionability</u>

156.    Plaintiff repeats the allegations of the first 155 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

157.    Any purported contracts between Plaintiff and Defendants are unconscionable, both procedurally and substantively, and are therefore unenforceable and void.

158.    As a result of the illegal, unlawful and unconscionable acts of the Defendants, the Plaintiff has suffered damages.

WHEREFORE, the Plaintiff demands judgment:

       A.    Finding that the acts and omissions of the Defendants constitute multiple instances of unlawful practices in violation of the aforesaid New Jersey laws and any agreements directly or indirectly related thereto are unconscionable, unenforceable and void ab initio;

       B.    Permanently enjoining and restraining the named Defendants, and Defendant John Doe(s) 1-100, said names being fictitious, being defined as their owners, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives,

independent contractors, co-conspirators and any banks and/or financial institutions into which Plaintiff's or class members' money was deposited, and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

C.    Freezing all assets of the Defendants wherever located and preventing Defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

D.    Disgorgement of all illegal fees, charges and costs and other funds not already paid to creditors of the victimized Plaintiff so as to restore to him any money acquired by the unlawful acts of the Defendants;

E.    Compensatory and punitive damages and trebling of the damages of Plaintiff as permitted by the Consumer Fraud Act and New Jersey Civil RICO Act and other New Jersey law;

F.    Requiring the Defendants to pay all attorney's fees, costs and litigation expenses incurred by the Plaintiff;

G.    Requiring Defendants to pay pre-judgment interest on all of Plaintiff's damages;

H.    Such other relief as the Court deems equitable and just under the circumstances.

COUNT SEVEN
<u>Class Certification</u>

159.    Plaintiff repeats the allegations of the first 158 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

Page 45 of  59

160.    This class action is brought on behalf of a class composed of all citizens or residents of the State of New Jersey who established or on whose behalf was established trust or escrow accounts maintained by the Defendants in a bank or other financial institution into which monies of the class members were transferred or deposited for the purpose of or relating to services provided by the Defendants or other persons or entities in connection with debt adjustment or credit counseling services and money transmission from the period beginning six (6) years before the filing of the initial State Court Complaint on March 22, 2019 to date.

161.    Members of the proposed class number in the thousands and are so numerous that their joinder is impracticable.

162.    There are questions of law and fact common to each class.

163.    The claims and defenses of the named Plaintiff are typical of the claims and defenses of the proposed class.

164.    The named Plaintiff is a member of the proposed class and will fairly and adequately protect the interests of the proposed class.

165.    The Defendants have acted and refused to act on grounds generally applicable to the class, making final injunctive relief appropriate, respecting the class as a whole and rendering class certification appropriate.

166.    Common questions of law and fact central to the claims of the class predominate over individual questions rendering class certification appropriate.

167.    The class action device is a superior method of adjudicating the class members' claims as compared to other available methods for fairly and efficiently adjudicating this controversy. Class members are financially distressed persons who have no meaningful recourse

against the Defendants absent collective pursuit of their momentarily small claims.  The value of class members claims taken individually is such that the claims cannot as a practical matter be pursued on an individual basis.

WHEREFORE, Plaintiffs demand certification of the class as set forth herein.

COUNT EIGHT
Other Damages to the Lead Plaintiff

168.    Plaintiff repeats the allegations of the first 167 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

169.    Plaintiff, besides being damaged by the payment of unlawful fees, charges and costs, sustained other damages in her own right through:

A.      Accumulation of interest and penalty charges on the debts which were enrolled in the fraudulent plan;

B.      Emotional distress, pain and suffering;

C.      Attorney's fees, out of pocket costs, court costs and litigation expenses;

D.      Degradation of her credit score and rating;

E.      Failure to return all monies paid by the Plaintiff; and

F.      Any other unlawful activities of the Defendants.

170.    These damages were caused by these unlawful acts of the Defendants and are in violation of the New Jersey Consumer Fraud Act, the New Jersey Civil RICO Act, the New Jersey Debt Adjustment and Credit Counseling Act, the Money Transmitters Act and the other tortuous conduct as plead and constitute a conversion of Plaintiff's funds.

WHEREFORE, Plaintiff demands judgment against all Defendants for compensatory and punitive damages, treble damages as permitted by law, attorneys fees, costs, litigation expenses,

pre-judgment interest and any other relief the Court deems equitable and just under the circumstances.

<u>COUNT NINE</u>

171.    Plaintiff repeats the allegations of the first 170 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

172.    Owners, members, officers, agents, and employees of limited liability entities may be liable individually for RICO, CFA and other violations of law that are directly attributably to acts undertaken by them through that entity.

173.    If the principal Defendants have engaged in tortuous conduct, then participating in that conduct by the participating Defendants and injury to the victims in sufficient to impose liability upon them.

174.    The participating Defendants are personally liable to consumers whose money or property has been misappropriated, converted, or obtain unlawfully or illegally by them to the uses of the principal Defendants even if the participating Defendants derived no personal benefit therefrom and acted merely as agents of the participating Defendants.

175.    It matters not whether the participating Defendants actions were intentional or negligent, or arose from common law, statutory, or regulatory law.

176.    The actions of the participating Defendants were sufficiently direct or closely connected to those of the principal Defendants they are deemed to have participated or co-operated therein to the extent that precludes their exculpation from liability.

177.    All the participating Defendants sufficiently participated in the unlawful acts and practice as described herein of the principal Defendants by, including without limitation, by

conspiring with them by making policy decisions to continue such conduct, being materially involved in the day to day operations of the principal Defendants, actually performing the unlawful acts, dealing directly with the clients of and financial institutions utilized by the principal Defendants, hiring others to perform said acts, by ignoring the warnings that the clients of the principal Defendants were engaged in unlawful and illegal acts, failing to investigate said clients of the principal Defendants, continuing to conduct the business of the principal Defendants in spite of knowledge of the unlawful acts of the principal Defendants and their clients, continuing to process ACH and other electronic transactions despite such knowledge, receiving remuneration for conducting the unlawful acts, and forming limited liability entities for the purpose of conducting illegal and unlawful acts and to shield themselves from personal liability for such acts.

WHEREFORE, the Plaintiff demands judgment:

A.     Finding that the acts and omissions of the Defendants constitute multiple violations of Civil RICO, N.J.S.A. 2C:41-1, et seq.;

B.     Finding that the acts and omissions of the Defendants constitute multiple instances of unlawful practices in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.;

C.     Permanently enjoining and restraining the named Defendants, and Defendants John Doe(s) 1-100, said names being fictitious, being defined as their owners, members, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, independent contractors, co-conspirators and any banks and/or financial institutions into which Plaintiff's or class members' money was deposited, and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and

scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

      D.     Freezing all assets of the Defendants wherever located and preventing Defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

      E.     Disgorgement of all illegal fees, charges and costs and other funds not already paid to creditors of the victimized Plaintiffs so as to restore to them any money acquired by the unlawful acts of the Defendants;

      F.     Compensatory and punitive damages and trebling of the damages of Plaintiffs as permitted by the Consumer Fraud Act and New Jersey Civil RICO Act;

      G.     Requiring the Defendants to pay all attorney's fees, costs and litigation expenses incurred by the Plaintiffs;

      H.     Requiring Defendants to pay pre-judgment interest on all of Plaintiffs' damages;

      I.     Such other relief as the Court deems equitable and just under the circumstances.

<u>COUNT TEN</u>

178.    Plaintiff repeats the allegations of the first 177 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

179.    A purchaser or transferee of a limited liability entity assumes liability for the debts and liabilities of the transferor if the transferee entity is merely a continuation of the transferring entity, or the transaction amounts to a consolidation or merger of the entities, or the transaction

Page 50 of 59

was entered into fraudulently in order to escape responsibility for debts and liabilities, or the transferee carries on the same business in which the transferor was engaged.

180.    A de facto merger or conti nuation of business takes place when the facts reveal an intent for the successor to assume all the benefits and burdens of the predecessor's business.

181.    A successor cannot avoid liability by simply structuring a cash for asset sale or when the successor entity is really the same company as the predecessor, i.e. the alter ego of the predecessor.

182.    The focus is on the existence of a disguised continuance or an attempt to avoid obligations through a sham transaction or technical change in operations. Factors to consider are whether the two companies have substantially identical management, business purposes , shared or not, operation, equipment, staff, assets, customers, supervision and ownership.

183.    The principal Defendants in effect are one entity, operating from the same location utilizing the same officers, employees, staff, website, contracts, and name, continuing or operating the same business, sharing revenue, merging or joining together to constitute a defacto merger, transferring interests in each other to some or all of the other principal or participating defendants, having common ownership, engaging in the same unlawful acts, forming other limited liability entities in an attempt to avoid liability for such actions, and making transfers for inadequate consideration to effectuated these ends.

184.    The participating Defendants in effect are one entity, operating from the same location utilizing the same officers, employees, staff, website, contracts, and name, continuing or operating the same business, sharing revenue, merging or joining together to constitute a defacto merger, transferring interests in each other to some or all of the other principal or

participating defendants, having common ownership, engaging in the same unlawful acts, forming other limited liability entities in an attempt to avoid liability for such actions, and making transfers for in adequate consideration to effectuated these ends.

WHEREFORE, the Plaintiff demands judgment:

A.      Finding that the acts and omissions of the Defendants constitute multiple violations of Civil RICO, N.J.S.A. 2C:41-1, et seq.;

B.      Finding that the acts and omissions of the Defendants constitute multiple instances of unlawful practices in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.;

C.      Permanently enjoining and restraining the named Defendants, and Defendants John Doe(s) 1-100, said names being fictitious, being defined as their owners, members, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, independent contractors, co-conspirators and any banks and/or financial institutions into which Plaintiff's or class members' money was deposited, and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

D.      Freezing all assets of the Defendants wherever located and preventing Defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

E.      Disgorgement of all illegal fees, charges and costs and other funds not already paid to creditors of the victimized Plaintiffs so as to restore to them any money acquired by the unlawful acts of the Defendants;

F.      Compensatory and punitive damages and trebling of the damages of Plaintiffs as permitted by the Consumer Fraud Act and New Jersey Civil RICO Act;

G.      Requiring the Defendants to pay all attorney's fees, costs and litigation expenses incurred by the Plaintiffs;

H.      Requiring Defendants to pay pre-judgment interest on all of Plaintiffs' damages;

I.      Such other relief as the Court deems equitable and just under the circumstances.

<u>COUNT ELEVEN</u>

185.    Plaintiff repeats the allegations of the first 184 paragraphs of the Complaint and incorporates the same by reference as if set forth at length herein.

186.    To pierce the limited liability veil to impose liability on the owners or members of the limited liability entity, one must ascertain facts evidencing among other things 1) Inadequacy of consideration or failure to observe corporate formalities to determine if the entity was a mere instrumentality of the owners or members reaching the point of dominance such that there is such a unity of interest and ownership that the separate personality of the entity and individuals no longer exists, the alter ego scenario, 2) engagement of unlawful, illegal, and unjust practices.

187.    The actions of the Defendants as described herein satisfy the requirements to pierce the veil of limited liability in that, among other things, Chaya, Winters, Austin, and other of the participating Defendant owners or members have set up and operated the principal defendants so as to conduct the unlawful practices described herein.

188.    The principal Defendants are merely the alter egos of the participating Defendants and are dominated in the operation of their business by them to obtain unlawfully compensation from the consumer victims, as described herein.

189.    Some participating Defendants are merely the alter ego of the other participating Defendants set up and formed for the same unlawful purposes, as described herein.

WHEREFORE, the Plaintiff demands judgment:

A.    Finding that the acts and omissions of the Defendants constitute multiple violations of Civil RICO, N.J.S.A. 2C:41-1, et seq.;

B.    Finding that the acts and omissions of the Defendants constitute multiple instances of unlawful practices in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.;

C.    Permanently enjoining and restraining the named Defendants, and Defendants John Doe(s) 1-100, said names being fictitious, being defined as their owners, members, officers, directors, shareholders, founders, managers, agents, servants, employees, representatives, independent contractors, co-conspirators and any banks and/or financial institutions into which Plaintiff's or class members' money was deposited, and all other persons or entities directly or indirectly under their control or participating in the unlawful plan and scheme from engaging in, continuing to engage in or doing any of the acts or practices set forth in this Complaint;

D.    Freezing all assets of the Defendants wherever located and preventing Defendants from engaging in any act of disposition of those assets in accordance with N.J.S.A. 56:8-8;

E.    Disgorgement of all illegal fees, charges and costs and other funds not

already paid to creditors of the victimized Plaintiffs so as to restore to them any money acquired by the unlawful acts of the Defendants;

F.      Compensatory and punitive damages and trebling of the damages of Plaintiffs as permitted by the Consumer Fraud Act and New Jersey Civil RICO Act;

G.      Requiring the Defendants to pay all attorney's fees, costs and litigation expenses incurred by the Plaintiffs;

H.      Requiring Defendants to pay pre-judgment interest on all of Plaintiffs' damages;

I.      Such other relief as the Court deems equitable and just under the circumstances.

> POLINO and PINTO, P.C.
> A Professional Corporation
> Attorneys at Law
> 720 East Main Street, Suite 1C
> Moorestown, NJ 08057
> (856) 727-1777
> Email: Jfpolino@prodigy.net
>
>
> BY: /s/ Joesph M. Pinto
>      Joseph M. Pinto, Esquire
>      Attorney for Plaintiff

## SPOLIATION NOTICE

TO ALL Defendants

You are hereby given notice not to destroy, conceal or alter any paper or electronic files and other data generated by and/or stored on your computers and storage media (e.g., hard disks, floppy disks, backup tapes, Zip cartridges, CDs, DVDs, etc.), or any other electronic data, such as voice mail. As you know, your failure to comply with this notice can result in severe sanctions being imposed by the Court for spoliation of evidence or potential evidence.

Through discovery we expect to obtain from you a number of documents and things, including files stored on your computers and your computer storage media.

As part of our initial discovery efforts, you will soon receive initial interrogatories and requests for documents and things, requests for admissions and other forms of discovery.

In order to avoid spoliation, you will need to provide the data requested on the original media, or on exact copies of that media (sometimes referred to as image, evidentiary, or mirror copies), and be able to prove that the copy matches the original in every respect. Do not reuse any media to provide this data.

Additionally, in order to avoid spoliation you may have to suspend certain normal computer maintenance procedures, including but not limited to such procedures as defragmenting hard drives, deleting internet cookies, deleting browser history and favorites, and running any "disk clean-up" processes.

Although we may bring a motion for an order preserving documents and things from destruction or alteration, your obligation to preserve documents and things for discovery in this case arises in law and equity independently from any order on such motion.

Electronic documents and the storage media on which they reside contain relevant, discoverable information beyond that which may be found in printed documents. Therefore, even where a paper copy exists, we will seek all documents in their electronic form along with information about those documents contained on the media. We also will seek paper printouts of only those documents that contain unique information after they were printed out (such as paper documents containing handwriting, signatures, marginalia, drawings, annotations, highlighting and redactions) along with any paper documents for which no corresponding electronic files exist.

Our discovery requests will ask for certain data on the hard disks, floppy disks and backup media used in your computers, some of which data are not readily available to an ordinary computer user, such as "deleted" files and "file fragments." As you may know, although a user may "erase" or "delete" a file, all that is really erased is a reference to that file in a table on the hard disk; unless overwritten with new data, a "deleted" file can be as intact on the disk as any "active" file you would see in a directory listing.

Accordingly, electronic data and storage media that may be subject to our discovery requests and that you are obligated to maintain and not alter or destroy, include but are not limited to the following:

<u>Introduction: Description of Files and File Types Sought</u>

All digital or analog electronic files, including "deleted" files and file fragments, stored in machine-readable format on magnetic, optical or other storage media, including the hard drives

or floppy disks used by your computers and their backup media (e.g., other hard drives, backup tapes, floppies, Jaz or Zip cartridges, CD-ROMs, DVDs) or otherwise, whether such files have been reduced to paper printouts or not. More specifically, you are to preserve all e-mails, both sent and received, whether internally or externally; all word-processed files, including drafts and revisions; all spreadsheets, including drafts and revisions; all databases; all CAD (computer-aided design) files, including drafts and revisions; all presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint); all graphs, charts and other data produced by project management software (such as Microsoft Project); all data generated by calendaring, task management and personal information management (PIM) software (such as Microsoft Outlook or Lotus Notes); all data created with the use of personal or portable data assistants (PDAs), such as Blackberry, PalmPilot, HP Jornada, Cassiopeia or any other Windows CE-based or Pocket PC device; all data created with the use of document management software; all data created with the use of
paper and electronic mail logging and routing software; all Internet and Web browser-generated history files, caches and "cookie" files generated at the workstation of each employee and/or agent in your employ and on any and all backup storage media; and any and all other files generated by users through the use of computers and/or telecommunications, including but not limited to voice mail.

Further, you are to preserve any log or logs of network use by employees or otherwise, whether kept in paper or electronic form, and to preserve all copies of your backup tapes and the software necessary to reconstruct the data on those tapes, so that there can be made a complete, bit-by-bit "mirror" evidentiary image copy of the storage media of each and every personal computer (and/or workstation) and network server in your control and custody, as well as image copies of all hard drives retained by you and no longer in service, but in use at any time from six (6) years before the date the Complaint was filed to the present.

You are also to preserve and not destroy all passwords, decryption procedures (including, if necessary, the software to decrypt the files); network access codes, manuals, tutorials, written instructions, decompression or reconstruction software, and any and all other information and things necessary to access, view and (if necessary) reconstruct the electronic data we will request through discovery.

1.      Business Records:  All documents and information about documents containing backup and/or archive policy and/or procedure, document retention policy, names of backup and/or archive software, names and addresses of any offsite storage provider.

A.      All e-mail and information about e-mail (including message contents, header information and logs of e-mail system usage) sent or received concerning the subject matter of this Complaint;

B.      All databases (including all records and fields and structural information in such databases), containing any reference to and/or information about or related to the subject matter of this Complaint;

Page 57 of  59

C.    All logs of activity (both in paper and electronic formats) on computer systems and networks that have or may have been used to process or store electronic data containing information about or related to the subject matter of this Complaint;

D.    All word processing files, including prior drafts, "deleted" files and file fragments, containing information about or related to the subject matter of this Complaint;

E.    With regard to electronic data created by application programs which process financial, accounting and billing information, all electronic data files, including prior drafts, "deleted" files and file fragments, containing information about or related to the subject matter of this Complaint;

F.    All files, including prior drafts, "deleted" files and file fragments, containing information from electronic calendars and scheduling programs regarding or related to the subject matter of this Complaint;

G.    All electronic data files, including prior drafts, "deleted" files and file fragments about or related to the subject matter of this Complaint.

2.    Online Data Storage on Mainframes and Minicomputers: With regard to online storage and/or direct access storage devices attached to your mainframe computers and/or minicomputers: you are not to modify or delete any electronic data files, "deleted" files and file fragments existing at the time of service of the Summons and this Complaint upon you, which meet the definitions set forth in this notice, unless a true and correct copy of each such electronic data file has been made and steps have been taken to assure that such a copy will be preserved and accessible for purposes of this litigation.

3.    Offline Data Storage, Backups and Archives, Floppy Diskettes, Tapes and Other Removable Electronic Media: With regard to all electronic media used for offline storage, including magnetic tapes and cartridges and other media that at the time of service of the Summons and this Complaint upon you containing any electronic data meeting the criteria listed in paragraph 1 above: you are to stop any activity that may result in the loss of such electronic data, including rotation, destruction, overwriting and/or erasure of such media in whole or in part. This request is intended to cover all removable electronic media used for data storage in connection with your computer systems, including magnetic tapes and cartridges, magneto-optical disks, floppy diskettes and all other media, whether used with personal computers, minicomputers or mainframes or other computers, and whether containing backup and/or archive data sets and other electronic data, for all of your computer systems.

4.    Replacement of Data Storage Devices: You are not to dispose of any electronic data storage devices and/or media that may be replaced due to failure and/or upgrade and/or other reasons that may contain electronic data meeting the criteria listed in paragraph 1 above.

5.    Fixed Drives on Stand-Alone Personal Computers and Network Workstations: With regard to electronic data meeting the criteria listed in paragraph 1 above, which existed on fixed drives attached to stand-alone microcomputers and/or network
workstations at the time of service of the Summons and this Complaint upon you:  you are not to alter or erase such electronic data, and not to perform other procedures (such as data compression and disk de-fragmentation or optimization routines) that may impact such data, unless a true and correct copy has been made of such active files and of completely restored versions of such deleted electronic files and file fragments, copies have been made of all directory listings (including hidden files) for all directories and subdirectories containing such files, and arrangements have been made to preserve copies during the pendency of this litigation.

6.    Programs and Utilities: You are to preserve copies of all application programs and utilities which may be used to process electronic data covered by this notice.

7.    Log of System Modifications: You are to maintain an activity log to document modifications made to any electronic data processing system that may affect the system's capability to process any electronic data meeting the criteria listed in paragraph 1 above, regardless of whether such modifications were made by employees, contractors, vendors and/or any other third parties.

8.    Personal Computers Used by Your Employees and/or their Secretaries and Assistants: The following steps should immediately be taken to safeguard all personal computers used by you, your employees and/or their secretaries and assistants.

A.    As to fixed drives attached to such computers: (I) a true and correct copy is to be made of all electronic data on such fixed drives relating to this matter, including all active files and completely restored versions of all deleted electronic files and file fragments; (ii) full directory listings (including hidden files) for all directories and subdirectories (including hidden directories) on such fixed drives should be written; and (iii) such copies and listings are to be preserved until this matter reaches its final resolution.

B.    All floppy diskettes, magnetic tapes and cartridges, and other media used in connection with such computers prior to the date of service of the Summons and this Complaint upon you containing any electronic data relating to this matter are to be collected and put into storage for the duration of this lawsuit.

9.    Evidence Created Subsequent to This Notice: With regard to electronic data created subsequent to the date of service of the Summons and this Complaint upon you, relevant evidence is not to be destroyed and you are to take whatever steps are appropriate to avoid destruction of evidence.

In order to assure that your obligation to preserve documents and things will be met, please forward a copy of this notice to all persons and entities with custodial responsibility for the items referred to in this notice.